# A. CHRISTINE KEPPLE ET AL. *v.* LINDA R. DOHRMANN ET AL.
## (AC 34056)

DiPentima, C. J., and Bear and Espinosa, Js.

Argued December 7, 2012—officially released March 12, 2013

*Jonathan M. Starble*, with whom, on the brief, was *Brooke M. Meling*, for the appellants (plaintiffs).

*Andrew R. Cellemme*, with whom was *Matthew R. Kinell*, for the appellees (defendants).

*Opinion*

BEAR, J. The plaintiffs, A. Christine Kepple and Mark R. Kepple, appeal from the judgment of the trial court rendered in favor of the defendants, Linda R. Dohrmann, William F. Dohrmann, Jane H. Lionelli and Frank E. Lionelli, on their statute of limitations defense to the plaintiffs' action for a declaratory judgment. On appeal, the plaintiffs claim in relevant part that the court improperly concluded that the document entitled "RESTRICTIVE COVENANTS AND AGREEMENTS" (covenant document) created a private restriction on the defendants' properties, rather than a view easement in favor of the plaintiffs,[1] thereby leading the court to conclude, improperly, that General Statutes § 52-575a barred the plaintiffs' claims. We reverse the judgment of the trial court.[2]

The following facts, which are not in dispute, are relevant to our resolution of the plaintiffs' claim on appeal. The parties own adjoining residential properties

---

[1] We use the terms view easement and visual easement synonymously throughout this opinion.

[2] Because we agree with the plaintiffs' first claim, we conclude that it is not necessary to discuss their alternate claims.

in the Great Bay Estates subdivision (subdivision) in the town of Stonington. The Dohrmanns are the owners of lot A, the Lionellis are the owners of lot B, the plaintiffs are the owners of lot C and William B. Ware and Vicki J. Ware, who are not parties to this action but who received notice of the action, are the owners of lot D. In connection with the creation of the subdivision, the owners of the Great Bay Estates, Chester J. Godomsky and Fredericka Ann Singer Schmidt, recorded the covenant document on the Stonington land records on April 3, 1980. The covenant document provides in relevant part:

"5. The owner of Lot C must construct his single family residence on the westerly portion of Lot C. It must be confined to that portion of Lot C which is within 140 feet of the easterly line of the private road which borders the westerly portion of Lot C as designated in said plan.

"6. The owner of Lot B must construct his single family residence on the easterly portion of Lot B. It must be confined to that portion of Lot B which is within 140 feet of the easterly line of Lot B. The remaining portion of Lot B shall be subject to a visual easement to the benefit of Lots C and D hereinafter mentioned in Paragraph 7.

"7. No trees, bushes, shrubs, or man-made objects or any other natural or unnatural substance on the remaining portion of Lot B which shall not be used for residential building purposes as defined in Paragraph 6 may attain a height which shall arise five (5) feet above the highest natural point of Lot C in the area which is restricted to the building area within Lot C; that area which extends 140 feet from the easterly side of the private roadway as designated in said plan.

"8. The owner of Lot A shall not be restricted as to where he may build a single family residence within

the confines of Lot A. However he shall be restricted to a [thirty] foot maximum height level for his structure. Further, no tree, bushes, shrubs, man-made objects, or any other natural or unnatural substances shall attain such a height as to rise five (5) feet above the highest natural point within the confines of the building area of Lot C as hereinbefore mentioned. . . .

"10. These restrictions shall be considered to be covenants running with the land.

"11. Any of the covenants or restrictions outlined in 1. through 10. may be released with the written consent of the land owners provided that such written consent shall be recorded on the land records of the [t]own of Stonington."

The defendants affirmatively alleged by counterclaim that they have permitted vegetation on lot A and lot B to attain a height that exceeds the permitted maximum height provided in the covenant document. The parties agree that they all are subject to the covenant document.

In a complaint filed August 12, 2009, the plaintiffs brought an action against the defendants for interference with easement rights, and they sought a declaratory judgment regarding a claimed visual easement over each of the defendants' properties, requiring the defendants to remove or trim all objects presently in violation of the claimed visual easement. The plaintiffs also sought to enjoin the defendants from further violations of their easement rights. In response, the defendants filed an answer and special defense, asserting, in relevant part, that the plaintiffs had a private restriction, rather than a visual easement, and that the action was barred by virtue of the statute of limitations for private restrictions set forth in § 52-575a. The defendants also

filed a counterclaim, asserting that if the covenant document had created a visual easement, that easement was extinguished by adverse possession.

Following a trial to the court, the court concluded that the covenant document contained private restrictions on each of the defendants' properties, rather than visual easements, and that the plaintiffs' action, therefore, was barred by the three year statute of limitations set forth in § 52-575a because the plaintiffs or their predecessor in title had known of the defendants' violation of the restrictions for more than three years before bringing the present action. This appeal followed.[3]

On appeal, the plaintiffs claim that the court improperly concluded that the covenant document created a private restriction on the defendants' properties, rather than a visual easement in favor of the plaintiffs, thereby leading the court to conclude, incorrectly, that § 52-575a was applicable to bar the plaintiffs' claims. We agree.

The parties agree that our standard of review for construing the covenant document is the standard employed when construing an instrument of conveyance or a deed. "[I]n construing a deed [or other conveyance], a court must consider the language and terms of the instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed or other conveyance, and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence.

---

[3] After being requested by the defendants to articulate its finding on their adverse possession claim, the court determined that the defendants had not proven their claim of adverse possession. There was no appeal taken from this aspect of the court's judgment.

. . . The construction of a deed in order to ascertain the intent expressed in the deed presents a question of law and requires consideration of all its relevant provisions in light of the surrounding circumstances." (Internal quotation marks omitted.) *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 456–57, 52 A.3d 702 (2012).

Because our resolution of this appeal, in part, requires us to interpret § 52-575a, we also set forth the principles governing our statutory interpretation. "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z.

Here, the trial court found that § 52-575a barred the plaintiffs' claims because the covenant document created a private restriction against the defendants, rather than an easement in favor of the plaintiffs, and § 52-575a bars an action to enforce a private restriction if the action is not commenced within three years of the plaintiff's knowledge of the violation.

Section 52-575a provides: "No action or any other type of court proceeding shall be brought to enforce a private restriction recorded in the land records of the municipality in which the property is located or a notation on a filed map pertaining to the use of privately owned land, the type of structures that may be erected thereon or the location of same unless such action or proceeding shall be commenced within three years of the time that the person seeking to enforce such restriction had actual or constructive knowledge of such violation. This section shall be deemed not to apply to any

private restriction or notation pertaining to (a) any public utility easement; (b) any right-of-way; (c) any park or open space land; (d) any private driveway, roadway or street, or (e) any sewer line or water line." The parties agree that if the covenant document conferred easement rights to the plaintiffs, then § 52-575a is not applicable.

Paragraph 6 of the covenant document specifically states that "[t]he remaining portion of Lot B shall be subject to a visual easement to the benefit of Lots C and D . . . ." The covenant document then set forth, in paragraph 7, certain restrictions on lot B: "No trees, bushes, shrubs, or man-made objects or any other natural or unnatural substance on the remaining portion of Lot B which shall not be used for residential building purposes as defined in Paragraph 6 may attain a height which shall arise five (5) feet above the highest natural point of Lot C in the area which is restricted to the building area within Lot C; that area which extends 140 feet from the easterly side of the private roadway as designated in said plan." The covenant document then explains, in paragraph 8, that the owner of lot A is not restricted as to where he may build his single-family home; he is, however, restricted as to the height of the residence and as to the height of trees, bushes, etc., "to . . . five (5) feet above the highest natural point within the confines of the building area of Lot C as hereinbefore mentioned." The covenant document also states that the restrictions are covenants that run with the land and that the covenants or restrictions may be released only with the written consent of the landowners, provided that the written consent is recorded on the land records.

Considering the intent of the drafter of the covenant document, as expressed in the document itself, and considering every part of the writing, as we must; see *Wykeham Rise, LLC* v. *Federer*, supra, 305 Conn.

456–57; we conclude that although only paragraph 6 of the covenant document specifically states that lots C and D have a visual easement over lot B, paragraphs 7 and 8, which define the restrictions on lots A and B evince the intent that the restrictions are for the benefit of visual easements over both lot B and lot A granted in favor of lots C and D. We therefore conclude that the covenant document grants to the plaintiffs a view easement over both lots A and B. See *Schwartz* v. *Murphy,* 74 Conn. App. 286, 293, 812 A.2d 87 (2002) (although deed did not use word "easement," "[t]here is no question that the restrictions in the defendants' deed express the intent to establish a view easement over the defendants' property"), cert. denied, 263 Conn. 908, 819 A.2d 841 (2003), cert. denied, 546 U.S. 820, 126 S. Ct. 352, 163 L. Ed. 2d 61 (2005).

The defendants argue that the court correctly determined that the plaintiffs were not granted a view easement in the covenant document, in part, because the covenant document "clearly create[s] restrictive covenants that limit the permissible use of both the Dohrmann [p]roperty and the Lionelli [p]roperty . . . [and] [t]he language does not . . . grant the Kepples any right to enter and use the properties or grant them any enforcement rights for a violation." Specifically, they contend that the covenant document cannot be construed as granting the plaintiffs an easement because there is no stated right to entry onto the defendants' land and no stated right to enforce any purported easement. We disagree that either of these are necessary to create a valid easement. See, e.g., *Schwartz* v. *Murphy,* supra, 74 Conn. App. 297–98 (defendants, by express terms of restrictive covenant, are prohibited from *placing* accessory structures or view obstructions in easement area; plaintiffs have right, although not specifically stated in deed, to clear any obstructions of view easement).

"An easement has six primary characteristics: (1) it is an interest in land in the possession of another, (2) it is an interest of a limited use or enjoyment, (3) it can be protected from interference by third parties, (4) it cannot be terminated at will by the possessor of the servient land, (5) it is not a normal incident of a possessory land interest, and (6) it is capable of creation by conveyance . . . . An easement may be affirmative or negative; appurtenant or in gross . . . . More modern approaches have expanded the use of easement to such areas as 'air rights,' the condominium and cooperative, 'cluster' developments, scenic easements, and beach access . . . ." (Citations omitted.) 4 R. Powell, Real Property (2010) § 34.01 [1], p. 34-1. "Under the unified concept, a negative easement may be designated as a negative easement or a restrictive covenant; the terms have been held to be interchangeable." 1 J. Backman & D. Thomas, A Practical Guide to Disputes Between Adjoining Landowners—Easements (2012) § 1.01 [2] [h], p. 1-13.

"Easements can be considered affirmative or negative. An affirmative easement authorizes uses of land that would be viewed as actionable trespasses if no easement existed. A right of way across a neighbor's property is a common example of an affirmative easement. A negative easement does not authorize the owner of the dominant land to do anything; instead, such an easement limits the activities of the servient tenement owner in the servient land. A negative easement, in other words, allows the holder of the easement to prevent the servient owner from actions on his land which, but for the existence of the easement, he normally would be able to do. For example, a landowner may be unable to build a structure on his property because his neighbor owns a negative easement allowing the easement owner an unobstructed view of

the land or water in the valley below." Id., § 1.01 [2] [h], p. 1-13.

Easements are created for a variety of reasons and do not require, as the defendants argue, that the dominant estate owner expressly have the right to "enter and use" the land of the servient estate in order for there to be a valid easement. See, e.g., General Statutes § 7-131d (establishing Charter Oak open space grant program creating permanent conservation easements over acquired property); General Statutes § 23-8a (requiring any person, organization or political subdivision to whom state proposes to convey state park land, forest land or other state land held as protected open space to execute conservation easement in favor of state before land may be conveyed); *Schwartz* v. *Murphy*, supra, 74 Conn. App. 293 ("[t]here is no question that the restrictions in the defendants' deed express the intent to establish a view easement over the defendants' property").

A view easement generally is considered to be a negative easement. "Negative easements prevent specific activities by the servient property such as a prohibition against certain types of improvements in order to protect the easement owner's right to sunlight or scenic views." 1 J. Backman & D. Thomas, supra, § 1.02 [2], p. 1-17. "In all jurisdictions, easements of light, air, and view may be created by express grant." 4 R. Powell, supra, § 34.11 [5], p. 34-125; see also *Schwartz* v. *Murphy*, supra, 74 Conn. App. 293.

Additionally, some alternative energy easements are negative easements. "There continues to be interest in wind energy as an alternative source of electric power. Serious use of this energy form requires an unobstructed wind flow which frequently can be assured through the use of negative easements on adjacent land." 9 R. Powell, Real Property (1998), § P8.11 [1],

p. P8-24. "Solar energy production requires access to sunlight. Natural and manmade structures on adjoining land can interfere with access to sunlight. One way to assure solar access is through an easement. Since a solar easement is a negative easement . . . it is unlikely that courts will recognize a prescriptive easement for solar access . . . . However, it is possible to obtain an express solar easement over a landowner's property to receive unobstructed sunlight." (Citations omitted.) Id., § P8.12 [1], p. P8-26.

Easements protecting historic properties are a form of negative easement. "Historic preservation easements seek to protect the character of privately owned historic buildings. . . . The most common historic preservation easement is the facade easement which prevents the owner from demolishing or changing the exterior of a historic building without the easement owner's consent. The owner of the historic building can continue to use the building and can generally change the building's interior. However, the easement requires that owners respect the property's historic features and refrain from inappropriate change and development. These easements are generally permanent and are important tools in protecting historic resources." (Citation omitted.) Id., § P8.10, pp. P8-22 through P8-23; General Statutes § 47-42a (a) (" '[c]onservation restriction' means a limitation, whether or not stated in the form of a restriction, easement, covenant or condition, in any deed, will or other instrument executed by or on behalf of the owner of the land described therein, including, but not limited to, the state or any political subdivision of the state, or in any order of taking such land whose purpose is to retain land or water areas predominantly in their natural, scenic or open condition or in agricultural, farming, forest or open space use").

Conservation easements also are within the category of negative easements. "Conservation easements are

the most frequently used legal device to limit the development of land. This type of easement generally seeks to preserve the servient estate in its natural state. Such an easement is accomplished by having the property owner convey selected development rights to a land trust or governmental agency. . . . The easement conveyed does not necessarily prohibit all development, but can be structured to allow limited development of the property. Conservation easements have been used to preserve open space in cluster developments. Every state has a law pertaining to conservation easements." (Citations omitted.) 9 R. Powell, supra, § P8.08 [1], pp. P8-17 through P8-18; see General Statutes § 7-131d (establishing Charter Oak open space grant program creating permanent conservation easements over acquired property); General Statutes § 23-8a (requiring any person, organization or political subdivision to whom state proposes to convey state park land, forest land or other state land held as protected open space to execute conservation easement in favor of state before land may be conveyed). All of the foregoing so-called negative easements protect or require property to be left or maintained in a specific condition, whether or not the dominant estate has a delineated right of entry onto or access to the servient estate.

Although an easement does not create an ownership interest in the servient estate but creates a mere privilege to use the servient estate in a particular manner, "an easement involves limited rights to enjoy or to restrict another's use of property." 1 J. Backman & D. Thomas, supra, § 1.01 [2] [a], p. 1-5. "If an easement is created to benefit and does benefit the possessor of the land in his use of the land, the benefit of that easement is appurtenant to the land. The land is being benefited by the easement in the neighboring property. . . . An important characteristic of appurtenant easements is that they continue in the respective properties, rather

than being merely personal rights of the parties involved. The easement's benefit or its burden passes with every conveyance affecting either the servient or dominant property." Id., § 1.01 [2] [g], p. 1-11.

We further are guided by our decision in *Schwartz* v. *Murphy*, supra, 74 Conn. App. 293, in which we concluded that although the deed at issue in that case did not contain the word "easement," the deed, by virtue of the restrictions contained therein, clearly expressed "the intent to establish a view easement over the defendants' property." The deed in *Schwartz* contained the following relevant restrictions: "(1) Restriction as to view obstruction and location of accessory structures affecting the southeasterly corner of the premises as shown on said map, 12226, (2) Notations as shown on Maps numbered 10716 and 12226 and (3) Restrictive covenants and agreements set forth in a certain agreement between Faye Dunaway and John A. Contegni, et al., dated February 2, 1981 . . . ." (Internal quotation marks omitted.) Id., 288. After considering this language, the trial court concluded that it evinced an intent to create a view easement. See id., 289. We agreed. Id., 290–95. In the present case, not only does the covenant document expressly state that the plaintiffs have a visual easement over lot B, but we are persuaded, as was the court in *Schwartz*, that the document also expresses the intent that the plaintiffs have a visual easement over lot A, as well.

*Schwartz* also provides guidance on the defendants' contention that the court properly concluded that the plaintiffs cannot have an easement because the covenant document contains no specified right to enforcement. In *Schwartz*, the deed specifically referenced, inter alia, map 12226. Id., 288. Map 12226 stated: "No accessory structures or view obstructions shall be placed in this area." (Internal quotation marks omitted.)

Id., 292. We explained that this language expressly "prohibited [the defendants] from *placing* accessory structures or view obstructions in the easement area." (Emphasis in original.) Id., 297. We further explained that "the defendants' deed contains no language concerning, nor is there evidence of, any other agreement that requires the defendants to maintain the view easement for the plaintiff. Under such circumstances, the law is clear that it is the plaintiff's responsibility to maintain the view easement at his expense, and he had no right to compel the defendants to maintain it for his benefit." Id., 297–98. Accordingly, although the deed and related documents contained no express right of enforcement, as a matter of law, the plaintiffs in *Schwartz* had a right to maintain the easement.[4]

On the basis of the foregoing, we conclude that the covenant document granted a view easement to the plaintiffs over lots A and B and, therefore, the statute of limitations contained in § 52-575a, concerning private restrictions, is not applicable in this case.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion the other judges concurred.

---

[4] In the present case, we make no determination as to whether the covenant document requires the defendants to maintain the easements on their respective properties or whether the plaintiffs, themselves, are responsible for maintaining the easements, but we leave those issues for the trial court to consider on remand.